Jason D. Lunders
*Pro Se*
450 Whitebird Street
Grangeville, ID 83530
(208) 507-0749

*Pro Se*



JUL 08 2022

CLERK, U.S. DISTRICT COURT
ANCHORAGE, AK

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JASON D. LUNDERS, an individual,<br><br>Plaintiff,<br><br>VIKING LUMBER COMPANY, INC., an Alaska Corporation, KIRK DAHLSTROM, an individual, and CHRIS MORROW, an individual,<br><br>Defendants. | Case No. 3:22-CV-00157-RRB<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

COMES NOW the Plaintiff, Jason D. Lunders ("Plaintiff"), and complains and alleges as follows as against Defendant Viking Lumber Company, Inc. ("Viking"), Defendant Kirk Dahlstrom ("Dahlstrom") and Defendant Chris Morrow ("Morrow"), collectively "Defendants":

### JURISDICTION AND VENUE

1. Plaintiff is a citizen of the state of Idaho.

2. Defendant Viking is an Alaska Corporation.

3. Defendant Dahlstrom is an individual, and upon information and belief, is a citizen of the state of Alaska.

4. Defendant Morrow is an individual, and upon information and belief, is a citizen of the state of Alaska.

COMPLAINT AND DEMAND FOR JURY TRIAL - 1

5. This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332. The amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000, and totals in excess of $1,000,000.

6. The Court has personal jurisdiction over Defendants as citizens of the state of Alaska.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## COUNT I: BREACH OF CONTRACT

8. In September, 2018, Defendant Kirk Dahlstrom, the secretary/treasurer of Defendant Viking, contacted Plaintiff, president of non-party IDC Enterprises, Inc. ("IDC"), to retain Plaintiff to perform portions of a large logging operation for Defendant Viking on several units in the "Rough Luck" timber sale and another one for a unit owned by the Alaska Mental Health Trust Authority. Together, these two projects were anticipated to yield 10-12 years of work for Plaintiff, as Defendants so represented. Plaintiff was advised that Viking would be upping their annual production to over 32 million board feet.

9. Plaintiff went to Alaska to meet with Defendant Dahlstrom and view the project. There were several units in the "Rough Luck" sale, and four of them had cut timber that needed to be logged out. Plaintiff was advised by Defendant Dahlstrom that they were to log approximately 25-32 million board feet annually, with 10-12 million board feet from the Alaska Mental Health Trust Authority property for the next ten years. Defendant Dahlstrom also showed Plaintiff several pieces of equipment and vehicles that Defendant Viking had agreed to purchase, which they would then sell to Plaintiff and/or IDC so they could begin logging on these projects.

10. The phases for the projects were divided among various contractors, so that one

COMPLAINT AND DEMAND FOR JURY TRIAL - 2

contractor (Defendant Morrow) would cut and fall the trees, de-limb them, and cut them into log-sized lengths ("bucking"). Another contractor (Papac) would build the logging roads needed, along with the temporary roads, and then do the work needed to reclaim the property and remove the roads when done. Plaintiff's tasks were to construct trails for the equipment, hook or pick up the cut and bucked logs, and get them to the roads to be loaded and hauled. Defendant Viking would provide the trucking to the mills, scale and process the logs, and pay the contractors for their work and labor on the jobs.

11. On or about October 1, 2018, Plaintiff, IDC and Defendant Viking entered into agreements for performance of the agreed-upon work in Alaska, to be done on behalf of Defendant Viking. Contracts were both for Plaintiff and IDC Enterprises, Inc. Plaintiff does not know why there were two contracts.

12. Pursuant to the agreements between the parties, Plaintiff caused several expensive, large pieces of logging equipment to be shipped to the site from Idaho through Seattle by barge, and at substantial cost and expense, in order to properly prepare for performance of the contract. Defendants did advance some of these shipping costs, but the bulk was incurred by Plaintiff. Moreover, Plaintiff incurred additional shipping costs not covered by Defendants.

13. Plaintiff began to do his agreed-upon work and performed it to the best of Plaintiff's ability but was unable to work full time due to the failure of the Defendants to comply with their obligations to Plaintiff under the contract.

14. Defendants never provided sufficient trucking to haul the logs as required. Plaintiff often would have 20 or more loads ready to go on a daily basis, and Defendants would usually not be able to haul more than 10 loads per day, if that. Defendants continued to assure Plaintiff that they would have sufficient trucking available, but those representations proved

untrue.

15.     In January, 2019, after several discussions between Plaintiff and Defendants' representatives, it was agreed that on January 17, there would be five trucks available. Plaintiff thereupon had two operators and loaders prepared for the trucks at 5:00 AM pursuant to the promises made. Plaintiff had sufficient timber and personnel on site to load 20 loads that day, but only two loads actually were trucked out of the site. The same occurrence happened on January 20, 2019; Plaintiff could have loaded 20 loads but in reality, only loaded 6 because of the lack of trucks. On January 22, 2019, Plaintiff hauled two loads himself on Plaintiff's truck to help the situation but was told by Defendants' representative(s) that he could not haul any more logs himself. The total from January 16-30, 2019, was 48 loads hauled where it should have been 175 loads, or more. From February 1-15, 2019, Viking only hauled 4 loads total. Plaintiff could have 20 loads per day to be loaded out; at one time, Plaintiff had 500 loads waiting to be hauled.

16.     Plaintiff and IDC were required to reduce their number of employees to cut overhead and had employees doing other jobs simply to keep busy. At this time, Plaintiff had approximately 225 loads of logs ready to load and be hauled, but there were no trucks being sent. Plaintiff learned that Defendants were shipping their trucks to other jobs, especially those being logged by a company in which Defendant Dahlstrom has a financial ownership interest. Defendants breached the contract with Plaintiff and acted in bad-faith by so doing.

17.     It was also Defendants' responsibility to assure that there was sufficient timber cut to allow Plaintiff to perform his tasks properly. However, over the course of performance, the cutting slowed and gradually ceased at times. Plaintiff picked up all of the timber that was cut and available, performed his jobs, and caught up to the cutters. During this period of time,

COMPLAINT AND DEMAND FOR JURY TRIAL - 4

sometimes there would only be one or two men with chainsaws doing the cutting, which would only produce approximately 3-6 loads per day.

18. Plaintiff and IDC had people waiting in camp to work on the logging project, causing Plaintiff to bear the full cost of lodging and subsistence for the crew members and allowing them to be ready for work, but Defendants simply had inadequate work available since they did not have timber cut. Plaintiff made several email and text message protests, besides oral protests, to no avail.

19. Plaintiff had conversations with the Forest Service about the jobs to assure they were in compliance with the requirements of the contract, and was assured they were performing satisfactorily, including in the meeting of the production goals. Plaintiff was continually requested by Defendant Viking's employees and managers to make sure the mills had logs coming in so they could generate output, while at the same time, Plaintiff's logs remained on-site too long because Defendants were not meeting their obligations to haul the logs to the Defendant Viking's own mill.

20. In July 2019, Defendant Dahlstrom, Defendant Viking's representative, purportedly terminated Plaintiff because of "poor production."

21. The termination was a breach of the contract between the parties, for which Plaintiff is entitled to damages for all of the timber scaled and not hauled; for all of the timber not able to be processed due to the unlawful termination; and for Defendants' failure to haul the timber that was properly prepared, all to Plaintiff's damage in such amount as may be proved at trial.

22. Plaintiff was assured that Defendants would provide trucking for 350 to 520 loads per month. In reliance thereon, Plaintiff and IDC provided the necessary equipment and

COMPLAINT AND DEMAND FOR JURY TRIAL - 5

employees to generate that amount of production per month, but Defendants never met that goal. Plaintiff had generated over 300 loads in the deck available to Defendants. However, the most that Defendants ever hauled in one month was 255 loads in May, 2019. From October-July, Defendant only hauled an average of 82 loads per month. This resulted in a loss of income for Plaintiff from $230,000-340,000 per month to less than $60,000.

23. In addition to the damages claimed herein, Plaintiff alleges damages caused by Defendants' inducement to Plaintiff to incur debt with Bank of the Pacific, which is believed to be Defendant Viking's bank, for the acquisition of specialized equipment to work in Alaska.

24. Defendants had continued to tell Plaintiff that he needed to purchase equipment from Defendants in order to do the work needed to be done. Plaintiff and IDC did in fact purchase items of equipment from Defendants, but much of the equipment proved to be defective and non-workable.

25. Defendants continued to encourage Plaintiff to hurry up and come to Alaska to begin work, because their mill "would run out of logs" if Plaintiff did not do so. Plaintiff informed Defendant Dahlstrom that he could purchase another item of equipment if Defendant Dahlstrom could assure that his bank would give Plaintiff's financing therefore. Plaintiff therefore incurred significant debt which he otherwise would not have.

26. Defendants also promised that they would provide a "lowboy" trailer for hauling equipment to and from job sites. Defendants did in fact tender a lowboy trailer but could not procure a title therefore. Moreover, that trailer was too wide for the jobsite. Plaintiff offered to haul his own lowboy trailer there, but Defendants said that they would provide Plaintiff with such a trailer. As a result, Plaintiff sold his lowboy trailer to another. However, just before Plaintiff was to leave for Alaska, Defendant Dahlstrom told Plaintiff that the trailer he had

originally thought of using would not work and Plaintiff would have to bring his own trailer. Since Plaintiff/IDC had sold the trailer in reliance on Defendant Dahlstrom's representations, they had to find another lowboy trailer and use funds from their operating line to pay for it.

27. Plaintiff had been promised work by Defendants for ten years if he would come to Alaska promptly. In reliance thereon, Plaintiff/IDC hired subcontractors to finish their Idaho jobs, expended substantial sums to move equipment to Alaska, and became deeper in debt to Bank of the Pacific for debt that it did not need to incur due to Defendants' subsequent breaches of the contract.

28. Thereafter, with the poor hauling provided by Defendants and the refusal to allow Plaintiff to haul his own logs to try and make up the shortfall, Plaintiff did not have sufficient funds to pay off the line of credit with Bank of the Pacific.

29. Plaintiff and IDC advised Defendants in July, 2019, that it was taking a month off to allow Defendants to get enough trees cut and trucks available to haul them.

30. However, thereafter, Bank of the Pacific called the notes, would not renew the lines of credit, and began repossession proceedings on the equipment in Alaska.

31. Plaintiff was damaged by Defendants' breaches of contract.

32. Plaintiff is entitled to damages as may be proved at trial. Because Defendants conduct was outrageous, including acts done with malice and bad motive with reckless indifference to Plaintiff, Plaintiff is or may be entitled to an award of punitive damages.

## COUNT II: BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

33. Plaintiff incorporates the allegations set forth above.

34. In every contract, there is implied covenant of good faith and fair dealing in order to effectuate the reasonable expectations of the parties to the agreement.

35. The implied covenant precludes a party from engaging in conduct that will defeat the purposes of the contract and ensures that neither party will do anything which will injure the right of the other to receive the benefit of the agreement.

36. Defendants acted in bad faith to deprive the Plaintiff of the benefit of the contract and failed to act in a manner that a reasonable person would consider fair.

37. Defendants breached the duty of good faith and fair dealing causing significant injury and damage to Plaintiff.

38. Plaintiff is entitled to damages for said breach in an amount to be proven at trial.

## COUNT III: CIVIL CONSPIRACY

39. Plaintiff incorporates the allegations set forth above.

40. Defendant Viking and its co-conspirators, Defendants Dahlstrom and Morrow, acted with the common purpose of damaging Plaintiff. They engaged in wrongful conduct to Plaintiff's detriment in furtherance of their wrongful purpose. Each of the co-conspirators acted with an illegal purpose and/or used illegal means to achieve their purpose.

41. Defendants had a meeting of the minds and/or entered into a combination or agreement, with one or more other persons, including each other, with the intent to wrongfully damage Plaintiff and to engage in other wrongful conduct to Plaintiff's detriment.

42. Each co-conspirator committed one or more unlawful and/or wrongful overt acts in furtherance of that object, including but not limited to the conduct described above.

43. Defendant Viking and its co-conspirators agreed to commit these wrongful acts in furtherance of their overall agreement and a common scheme.

44. As a result, Plaintiff has suffered significant damages, in an amount to be determined at trial.

45. Defendant Viking and its co-conspirators acted maliciously, and Plaintiff is or may be entitled to punitive damages.

46. Defendants are jointly and severally liable for their wrongdoing.

## COUNT IV: MISREPRESENTATION / FRAUDULENT INDUCEMENT

47. Plaintiff incorporates the allegations set forth above.

48. As identified hereinabove, Defendants, fraudulently, maliciously, recklessly, with scienter and with total indifference to Plaintiff made material promises and misrepresentations to Plaintiff. The promises and misrepresentations were materially fraudulent.

49. The misrepresentations induced Plaintiff to enter into business relationships and contract with Defendants, a contract that Defendants Viking and Dahlstrom never intended to perform.

50. Plaintiff's reliance on the promises and misrepresentations of Defendants was justified and caused him significant injury and damages for which Defendants are jointly and severally liable for their misrepresentations and fraudulent inducement.

## COUNT V: VIOLATIONS OF THE UNFAIR TRADE PRACTICES ACT

51. Plaintiff incorporates the allegations set forth above.

52. The Unfair Trade Practices and Consumer Protection Act ("UTPA") provides a private right of action by any "person who suffers an ascertainable loss of money or property as a result of another person's act or practice declared unlawful [under the UTPA]." AS 45.50.531(a).

53. The UTPA broadly prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce." AS 45.50.471(a).

54. An act or practice is *deceptive* under AS 45.50.471(a) if it can be interpreted in a misleading way.

55. An act or practice is *unfair* under AS 45.50.471(a) when the act or practice offends public policy, that is, whether it falls within some existing concept of unfairness that society has established through law or otherwise; the act or practice is immoral, unethical, oppressive, or unscrupulous; or the act or practice causes substantial injury. Unfairness may be found because of the degree to which the act or practice meets one or more of these factors. An act or practice may be unfair even though it is not deceptive.

56. In addition to filing a *prima facie* case under AS 45.50.471(a), there are over 50 specific practices identified in the UTPA that are *per se* violations. The Alaska Supreme Court has explained that "[t]he acts specified in AS 45.50.471(b) are unfair or deceptive by definition." *Per se* violations include, without limitation:

   i. When a party represents that "services have sponsorship, approval . . . that they do not have or that a person has . . . approval . . . that the person does not have;" AS 45.50.471(b)(4);

   ii. When a party uses or employs "deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged;" AS 45.50.471 (b)(12);

   iii. When a party represents "that an agreement confers or involves rights, remedies, or obligations which it does not confer or involve, or which are prohibited by law;" AS 45.50.471(b)(14).

57. Before Plaintiff signed the contract, Defendants stated, implied, or otherwise communicated to Plaintiff material misrepresentations and fraudulent promises.

58. Before Plaintiff signed the contract, or at any time material to this matter, Defendants never informed Plaintiff of its material misrepresentations and fraudulent promises.

59. These statements and omissions were made in the course of a business transaction with Plaintiff in which Defendants had a financial interest.

60. One or more of these statements or omissions relate to facts material to Plaintiff's decision to consummate the contract and in his decision to perform under the contract.

61. At the time Defendants made one or more of the statements or omissions in the factual assertions were materially false or misleading.

62. One or more of Defendants' statements and omissions constitute deceptive or unfair trade practice in violation of AS 45.50.471(a) because their statements or omissions:

    i. Misled and deceived Plaintiff to enter into the contract;

    ii. Caused Plaintiff to believe that Defendants wanted Plaintiff to perform under the contract and complete the work;

    iii. Caused Plaintiff to continue to perform under the contract;

    iv. Induced Plaintiff to begin the work, continue to perform the work at Plaintiff's expense in hopes that Defendants would eventually perform; and

    v. Caused Plaintiff substantial harm.

63. In violation of AS 45.50.471(b)(12), Defendants either deceived, made false pretenses, knowingly concealed, or omitted material facts related to Defendants' intent to perform in accordance with the contract terms in order to induce Plaintiff to enter into the contract.

64. Plaintiff suffered an ascertainable loss by one or more of Defendants' violations of the UTPA.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays judgment against Defendants for their breaches of contract, breach of the duty of good faith and fair dealing, conspiracy, fraudulent inducement and misrepresentations, and violation of the UTPA, in the amount to be proven at trial, but in excess of $1,000,000 for purposes of default, together with treble damages for Defendants' violation of the UTPA, reasonable attorneys' fees and costs of suit as authorized by the Alaska Civil rules and for Defendants' violations of the UTPA, and for such other relief as the Court may deem just, equitable, necessary, and proper. Punitive damages are or may also be available to Plaintiff pursuant to Alaska Stat. § 09.17.020.

DATED this 8th day of July, 2022.

By: _____
Jason D. Lunders
*Pro Se*

19226635_v2

COMPLAINT AND DEMAND FOR JURY TRIAL - 12